37768.   AMERICAN SURETY CORPORATION *et al.*
*v.* BUSH.

DECIDED DECEMBER 3, 1959.

*Smith, Field, Doremus & Ringel, Charles L. Drew,* for plaintiff in error.

*Irwin, Williams & Keen, R. Beverly Irwin,* contra.

QUILLIAN, Judge. The claimant, a carpenter, suffered various injuries as a result of a fall from a scaffold on December 8, 1955. The effects of the original injury lasted only a few weeks, but as a result of the administration of certain antibiotics in the course of treatment, the claimant developed a condition known as "black tongue" which has persisted since about a month after the original injury. According to the evidence, when he is able to work he must take medicine for this condition on the job and must take time off on numerous occasions to go to the doctor. Because of this, he has been unable on several occasions to obtain or to continue employment as a carpenter.

"Upon their own motion before judicial determination or upon the application of any party in interest on the ground of a change in condition, the State Board of Workmen's Compensation may, within two years from the date that the board is notified of the final payment of claim, review any award or any settlement made between the parties and filed with the board and, on such review, may make an award ending, diminishing or increasing the compensation previously awarded or agreed upon." Code (Ann.) § 114-709. "The prime requisite of a review under this Code section is that there be a change in the employee's physical condition between the time of the review and any

award made by the board or any settlement made between the parties and filed with the board, and the burden of establishing such requisite is upon the party claiming the change in condition." *Fortson* v. *American Surety Co.*, 92 *Ga. App.* 625 (2) (89 S. E. 2d 671). "A change of condition within the rule that after entering an award the Board of Workmen's Compensation may increase or decrease the compensation allowed thereunder due to a change of condition, means a change of the physical condition of the claimant *subsequent* to the first award." *Travelers Ins. Co.* v. *Hammond,* 90 *Ga. App.* 595 (3) (83 S. E. 2d 576); *Georgia Marine Salvage Co.* v. *Merritt,* 82 *Ga. App.* 111 (1) (60 S. E. 2d 419). The only finding as to change in condition is as follows: "I find further there is no evidence the employer has offered claimant any work which he is able to do. That claimant has worked for other employers when he was able to do so, and also sought employment but was turned down because of his physical impairment. I find therefore claimant has suffered a change in condition since the award of December 19, 1957, based on decrease in earning capacity. That whereas he was able to do some work in 1957, he had not been able to find work in 1958."

The claimant positively testified that he was suffering worse on account of the injuries caused by the accident which resulted in his disability and the disabling condition caused by the treatment of his injuries. The fall fractured his skull, the medicine gave him "black tongue." He swore that his head ached more and the black tongue condition was so bad that he could not work. Both conditions he positively testified had grown worse since the former award. The employer's medical witnesses admitted both conditions and their very distressing nature. The doctor testifying to his skull injury and consequent headaches, while of the opinion that the claimant could work, admitted he could not say whether the headaches had become progressively worse since the last award or agreement for compensation. So his testimony did not really contradict the claimant's, either as to his inability to work or that the injury received to his head had changed for the worse. The doctor who testified to the claimant's condition as black tongue described a most distressing

condition; indeed, the doctor termed it distressing and while pointing out that it would be a handicap to the claimant, testified that it alone would not prevent the claimant from working under certain conditions, such as carrying his medicine with him when he climbed up a ladder or leaving it behind and climbing back down for it. The condition that the doctor described as black tongue was: "To the best of my knowledge, in Mr. Bush's case, in itself it is not disabling. Now, I will modify that by saying that it might be inconvenient for him to carry his medicine with him and take it as directed, but, there again, we have no way of telling when this fungus can spread further and get in the tracheal bronchial tree and disseminate into the blood stream and cause a more serious infection. We never know when that might develop. But I think I can state that within the actual confines of his tongue, the presence of this fungus, and other resistant organisms on his tongue, that it is in no way going to prevent him from doing his usual occupation. Actually, the only inconvenience would be that he would have to take a fair amount of medicine at regular intervals and he might find inconvenience in carrying it around with him . . . Q. Would this condition in his mouth cause his mouth to taste like rotten eggs? A. Some have described it like rotten eggs, but then again others have described it, not in Mr. Bush's case necessarily, but it is a nasty, a vile, and almost what we in medical terms would call a fecal odor. This infestation of the tongue can be cleared up, but I recall one time where he had been treated by another practitioner who gave him a local antibiotic, a lozenge, and when I saw him again, or if he would eat frozen food that had been preserved with antibiotics, within a period of three or four days, the tongue would again become completely coated just as it was in the beginning, and we would have to start all over again."

It is notable that the doctor did not testify that the combination of the black tongue and headaches could not render the claimant unable to work, but simply that, in his opinion, the black tongue did not.

I am aware of the rule that a condition that merely makes it inconvenient or even painful for the claimant to perform the

duties of his employment does not necessarily incapacitate him to work. But this does not mean that a claimant must labor in unbearable torture so great as to prevent the effectiveness of his efforts to the extent that he is disabled to work and no employer considers him fit to work.

The whole of the claimant's testimony appears to be sufficient to make an issue of fact as to whether there had been a physical change in his condition: "Q. You were injured the 8th day of December, 1955, while working for the Henry C. Beck Company? A. Yes, sir. Q. Describe briefly to the court how you were injured. A. Well, we were working on a ladder, me and another fellow, and was putting up sheet rock and all of a sudden I heard him say, 'Grab it,' and we was falling, and everything went down. Well, I was out for two or three minutes, and when I came to, he took—I put my hand to the ear, started to put my hand to my ear, and blood filled my hand practically, came out all over my hand, fell out from my ear about that far, and they carried me to the hospital. I stayed down there about oh—they couldn't get a doctor, and I asked one of the boys to call my wife and she had to come to the hospital and call a doctor to treat me. Q. How long did you stay in the hospital? A. Well, two or three weeks. I forget now which it was. Q. Where were you hurt then? A. Where did it—right here. Q. All right, for the court reporter, you will have to state just where you put your hand, it was at the back right side of your head? A. Back right side of my head, right behind the side of the ear. Q. All right sir, where else? A. In my throat, in my mouth. I got stuff going into my mouth, my—hair grows on my tongue and the doctor has to shave my tongue just like a man would shave his face. Q. What causes that? A. Antibiotics. Q. Who prescribes them for you? A. Dr. Linebeck. Q. He is the doctor that has been treating you? A. Yes. Q. He's under subpoena to be here today? A. Yes, sir, and I'd like—here's a piece from another doctor that was in—Q. We can't go into all that. A. About these antibiotics, proving this caused fungus. Q. What did he give you that you know Dr. Linebeck has been treating you since you got out of the hospital? A. He's been treating me, Dr. Mabon been treating me—Q. Mabon? A. Yes, sir, he treat-

ed me too. Q. Now, about your eye, do you say that you have always been crossed, that left one? A. Left one has turned in. Q. It's turned in? A. It's turned in this way. Q. It was crossed before the accident? A. Yes. Q. But how does it operate now? A. It turns in and up. Q. Turns up now? A. Yes, sir. Q. You didn't have that? A. No, sir. Q. Did you before this accident? A. No, sir. Q. Let's get back to these antibiotics you are talking about. Do you know what you have been taking? A. Well, they give me that in the hospital. Q. Gave you that in the hospital? A. Yes. Q. What was that, do you know? A. Dr. Linebeck said Dr. Mabon give me penicillin and if I'm not mistaken he give me antibiotic capsules. I'm not sure. I took some capsules that he prescribed. Q. You don't know what that was? A. No. Q. Dr. Linebeck would know? A. He would know. He should know. Q. Now, you say you have hair growing on your tongue? A. Yes, sir. Q. You have to shave it off? A. He shaves it off. Q. Who? A. Dr. Linebeck. Q. You don't shave it? A. No sir. I can't shave my tongue. Q. Stick your tongue out. You got any hair growing on it? A. No, sir, not now and my tongue splits open. Q. Your tongue splits open? A. Yes, sir, cracks open and blood oozes out of it. Q. Now, how long—can you climb, and how does it feel when you try to carpenter? I believe you worked in '56 some? A. Yes, sir, I did. Q. How much did you make in 1956? A. About thirty-five hundred dollars. Q. After—during the time that you drew this compensation under the agreement, have you got the figures on that for the board? A. You mean how much they paid? Q. How much has the employer and the insurance company paid you since you got—had this fall and injury on the 8th day of December, 1955? A. I don't know exactly how much, but when the agreement was signed he paid me $752 in December, 1957 or 1956, and he told me whenever I got—Q. You say 'He?' A. Mr. James, insurance adjuster, told me whenever I got—Q. Now, in 1956 you say they didn't pay you any? A. Well, they paid me some in 1956. They paid me—now they paid me around about eleven hundred dollars, close to eleven hundred dollars for 1956, now they paid me that December 1957. Q. All at once? A. $752 of it. Q. They didn't pay you then by the week, $20 a week, according to this

—Q. Mr. Bush, they paid you on the 18th and 19th day of December, last year, a certain amount of money on this agreement in a lump sum, didn't they? A. Yes, sir. Q. How much was that? A. $752. That was for 1956. Mr. Carr says that's all he's supposed to pay me—all the agreement says. Q. In 1957 did they pay you anything? A. No, sir, Mr. Carr said the agreement didn't say that, just 1956 alone. Q. Agreement had nothing to do with 1957? A. What Mr. Carr said. Q. Were you able to do any work in 1957? A. Yes, sir, I worked some. Q. Some? A. Yes sir. Q. How much? What were you doing? A. Carpentering, whatever, whenever I could find a job. Most of the time they don't keep me long, take all this medicine on the job, get off and go to the doctor every other day, people just don't like to have you when you have to take medicine like that. Q. What happens to you, Mr. Bush, when you are working? Physically, how do you feel? A. I can't climb, gets me too nervous. I tried it on one job and I like to have fell. Q. You haven't climbed since? A. No, I work on the ground if I can find a job. Q. When is the last time you tried to do any work at all? A. December. Q. 1957—last year? A. Yes, sir. Q. Have you done any work this year at all? A. No sir. Q. Have you been able to? A. Well, half the time I am. The other half nobody will hire me. Q. Has your condition gotten any better, we will say, since December, 1957? A. No, sir. Q. Is it worse now than it was then when you signed those papers? A. Yes, sir, I think it is worse. I am more nervous. This stuff just makes you feel just weak. Q. What stuff you talking about? A. My mouth. Q. Your physical injuries—head, eyes, mouth and throat? A. Yes, only thing I can smell is this here fungus in my mouth. Can't smell nothing else. Q. Lost your smelling? A. All except this fungus. Stinks like rotten eggs all the time, night and day. Q. You take medicine for it, don't you? A. Fifteen or twenty dollars worth a week."

The evidence adduced upon the trial did not simply point to the conclusion that the claimant's condition had changed only in the sense that whereas previously it had not prevented him from being able to obtain employment, he could no longer find work. On the contrary, there was competent evidence in the

record that because of a marked deterioration in the claimant's physical condition resulting from the accident out of which his right to compensation arose and from its treatment, whereas he was in a physical condition such as met the requirements of the type of work he was engaged in at the time of the accident, he could no longer perform the functions necessary in such work, or work of a related kind, and for this reason no one would employ him. In other words, his condition became worse. As a result of this decline his physical adaption to the work he was engaged in when injured, since the previous award, rendered his services undesirable and not acceptable to employers, with the result that the claimant is disabled to work. It was distinctly a change in his physical condition that has rendered him unable to find work. This is in my opinion what the director meant to express in the award.

The facts of this case bring it within the holding of *Employers Liability &c. Corp.* v. *Hollifield*, 93 *Ga. App.* 51, 53 (90 S. E. 2d 681): "The incapacity for work resulting from such an injury is total not only so long as the injured employee is unable to do any work of any character, but also while he remains unable, as a result of his injury, either to resume his former occupation or to procure remunerative employment at a different occupation suitable to his impaired capacity. *Austin Bridge Co.* v. *Whitmire*, 31 *Ga. App.* 560, 566 (121 S. E. 345); *Lumbermen's Mutual Cas. Co.* v. *Cook*, 69 *Ga. App.* 131, 136 (25 S. E. 2d 67)."

Also pertinent to the issues of this case is *U. S. Fidelity &c. Co.* v. *Brazier*, 96 *Ga. App.* 743 (101 S. E. 2d 625).

*Judgment affirmed. Gardner, P. J., Townsend, Carlisle, and Nichols, JJ., concur. Felton, C. J., dissents.*

FELTON, Chief Judge, dissenting. "The prime requisite of a review under this Code section is that there be a change in the employee's physical condition between the time of the review and any award made by the board or any settlement made between the parties and filed with the board, and the burden of establishing such requisite is upon the party claiming the change in condition." *Fortson* v. *American Surety Co.*, 92 *Ga. App.* 625 (2) (89 S. E. 2d 671). "A change of condition, within the rule that after entering an award the Board of Work-

men's Compensation may increase or decrease the compensation allowed thereunder due to a change of condition, means a change of the physical condition of the claimant *subsequent* to the first award." *Travelers Ins. Co.* v. *Hammond*, 90 *Ga. App.* 595 (3) (83 S. E. 2d 576). *Georgia Marine Salvage Co.* v. *Merritt*, 82 *Ga. App.* 111 (1) (60 S. E. 2d 419). The only finding as to a change in condition is as follows: "I find further there is no evidence the employer has offered claimant any work which he is able to do. That claimant has worked for other employers when he was able to do so, and also sought employment but was turned down because of his physical impairment. I find therefore claimant has suffered a change in condition since the award of December 19, 1957, based on decrease in earning capacity. That whereas he was able to do some work in 1957, he had not been able to find work in 1958." Assuming that his inability to "find work" during 1958 was caused by his physical condition, such fact, standing alone, does not show a change in condition necessary to support the award. "The fact that in the instant case the injured employee was discharged from his employment, and, as a result of his physical condition which had not changed but which was due to the injury sustained, is unable to obtain employment, would not bring the case within the provisions of [Code § 114-709]". *Travelers Ins. Co.* v. *Hurt*, 176 *Ga.* 153, 155 (167 S. E. 175).

The finding that the claimant suffered a change in condition based on a decrease in earning capacity excludes the idea that the finding was based on a change for the worse in physical condition.